968 So.2d 789 (2007)
Janice M. HORNOT
v.
Leonard CARDENAS, III.
No. 2006-CA-1341.
Court of Appeal of Louisiana, Fourth Circuit.
October 3, 2007.
*792 Janice M. Hornot, Baton Rouge, LA, In Proper Person, Plaintiff/Appellant.
Henri M. Saunders, Baton Rouge, LA, for Defendant/Appellee, Leonard Cardenas, III.
(Court composed of Judge DENNIS R. BAGNERIS, SR., Judge MAX N. TOBIAS, JR., Judge LEON A. CANNIZZARO, JR.)
CANNIZZARO, Judge.
The defendant, Leonard Cardenas III, represented the plaintiff, Janice Hornot, in a personal injury lawsuit that arose out of an automobile accident in which Ms. Hornot was injured. Ms. Hornot was dissatisfied with Mr. Cardenas' representation in the personal injury case, and she filed the instant lawsuit against Mr. Cardenas. Mr. Cardenas filed a reconventional demand asserting that certain allegations against him made by Ms. Hornot in the petition in the instant case were defamatory. The trial court judge held that Ms. Hornot failed to present any facts to support her allegations in the instant case and that Mr. Cardenas was defamed by certain of those allegations. The trial court awarded Mr. Cardenas $7,500.00 in damages. Ms. Hornot is appealing the damage award. Mr. Cardenas answered the appeal and claimed that he is entitled to a higher damage award.

FACTS AND PROCEDURAL HISTORY
Both Ms. Hornot and Mr. Cardenas are attorneys licensed to practice in Louisiana. In the fall of 2001, Ms. Hornot contacted Mr. Cardenas and asked him to represent her in connection with an accident that occurred in March of 1996, in which an eighteen wheel truck hit her automobile and caused her to suffer various neck, arm, and shoulder injuries. Ms. Hornot had originally been represented by another attorney, but she wanted to hire Mr. Cardenas, because her original attorney was very busy with a major case. Suit had already been filed and some depositions had been taken prior to the time that Ms. Hornot contacted Mr. Cardenas.
In a letter to Ms. Hornot dated October 26, 2001, Mr. Cardenas discussed accepting Ms. Hornot as a client in connection with her lawsuit. He enumerated in the letter the following items that he thought the defendants in the suit would use to their advantage:
1.) Reporting no injury to the investigating police officer;
2.) Failing to receive any medical attention or treatment for approximately fifteen months after the accident;
3.) Having two intervening accidents before receiving medical treatment, one involving the fall and the other a rear-end accident about one month prior to your first medical visit following the subject accident;
4.) Your extensive preexisting history, including prior cervical fusion and the degenerative and progressive nature of that condition; and
5.) An apparent diagnosis of carpal tunnel syndrome prior to this accident.
Nevertheless, Mr. Cardenas noted that he believed Ms. Hornot had a legitimate case and that he was prepared to represent her, *793 but first he would need to review all of the file materials relevant to her case.
At the trial Ms. Hornot testified that one of the issues that arose in the accident case was her failure to seek medical treatment for some time after the accident. She explained that at the time of the accident she was working in an office that was in the process of trying to obtain group health insurance coverage, "so I thought I would wait to see if we might be able to get health insurance."
In a letter to Ms. Hornot dated January 10, 2002, Mr. Cardenas discussed the possibility of settling her personal injury case. He stated that "I believe that the insurance company may be willing to pay up to, but probably no more than, $100,000 if we push the matter." He suggested making a settlement demand of $185,000.00. Additionally, Mr. Cardenas explained his proposed fee. He stated, "If this matter can be settled at this time without further discovery, and as a professional and personal courtesy and favor to you, I am willing to reduce my fee to 17.5% of the gross amount recovered." Mr. Cardenas then asked Ms. Hornot to sign and date an enclosed copy of the letter to signify her assent to the contingency fee proposal.[1]
After sending Ms. Hornot the January 10 letter, Mr. Cardenas, with Ms. Hornot's consent, made a settlement offer of $200,000.00. In a letter of February 26, 2002, Mr. Cardenas advised Ms. Hornot that the defense attorney in her personal injury case was not interested in responding to her settlement offer at that time but would, instead, prefer to respond at a mediation.
Initially, Ms. Hornot refused to mediate her claims unless the defendants agreed to pay the entire cost of the mediation. In a letter dated March 12, 2002, Mr. Cardenas acknowledged receiving a voice mail message from Ms. Hornot in which she advised him that unless the defendants paid the entire cost of the mediation, she had no intention of participating in it. Mr. Cardenas' letter also confirmed that Ms. Hornot said that she felt that everyone was "ganging up" on her and that she did not want to expose herself to such behavior. After discussing the weaknesses of Ms. Hornot's case and his concern that "I am not going to be able to represent you to your satisfaction," Mr. Cardenas' March 12 letter advised Ms. Hornot that if he did not hear from her within the next two days, he would withdraw from representing her. Ultimately, Ms. Hornot agreed to pay half of the mediation cost, Mr. Cardenas represented Ms. Hornot at the mediation, and the personal injury case was settled for $95,000.00.
Ms. Hornot testified that "[i]n the early part of March of 2002 I had a telephone conversation with Mr. Cardenas in which he told me that the defense attorney had some evidence that I had committed insurance fraud and that he did not know the specifics of what the allegations were about the insurance fraud but that the defense attorney had evidence that convinced him, the defense attorney, that I had committed insurance fraud." Ms. Hornot further testified that when she spoke to Mr. Cardenas about filing a motion in limine to prevent the defense attorney from raising the issue of insurance fraud at trial, "Mr. Cardenas indicated that he did not want to taint the judge's *794 mind against me and perhaps suggest to the judge that I had done something that was illegal or improper or unethical. . . ."
Ms. Hornot said that she took Mr. Cardenas' March 12 letter, in which he suggested that he would resign from the personal injury case, very seriously. She was concerned about deadlines in the case, and she was concerned that she might have a difficult time finding another attorney if she had to tell the attorney that "the opposing counsel intended to accuse me of insurance fraud because he had some kind of evidence that I had committed insurance fraud." Ms. Hornot stated that she was concerned that if she did not go to mediation, Mr. Cardenas would withdraw as her attorney. Therefore, she felt compelled to proceed to mediation.
Ms. Hornot testified that although she knew she had not committed insurance fraud, she was concerned about the mediation being unfair, and she said that she was, therefore, under "emotional pressure." Ms. Hornot was asked what Mr. Cardenas' response was when she told him that she wanted to leave the mediation. Her response was that Mr. Cardenas said that she should not leave the mediation, that the allegations of insurance fraud were very serious, and that the defense attorney was very serious about the allegations. Ms. Hornot further said that Mr. Cardenas told her that "if I didn't settle the case that day, if I walked out of the mediation and didn't settle the case, that they intended to contact the Disciplinary Counsel and report me to the Disciplinary Counsel; and they intended to have me arrested for insurance fraud." Ms. Hornot further said that Mr. Cardenas had told her that he did not know the basis for the insurance fraud allegations.
During the mediation Ms. Hornot believed that her medical situation and her lost wages "didn't really matter." She believed that "[t]he main thing was that they had some kind of evidence that I had committed insurance fraud." She said that the defense intended to use that evidence against her and that she understood that the evidence was "solid and concrete and irrefutable and that it was very serious." In fact, Ms. Hornot testified that her main motivation in signing the settlement papers at the mediation was "the accusation of insurance fraud," about which she knew nothing. Subsequently, Ms. Hornot refused to sign the receipt and release for the settlement, and the settlement funds were held in Mr. Cardenas' client trust account. Ms. Hornot stated that she refused to sign the receipt and release, "[b]ecause it had some language in the Receipt and Release about the fact that I had not been coerced or pressured in order to settle the case; I had a problem with that language." Ultimately, according to Ms. Hornot's testimony, she did sign a judgment, which she had drafted, dismissing her claims in the personal injury suit.
In a letter dated July 12, 2002, that Mr. Cardenas wrote to Ms. Hornot, he said that he was very concerned and hurt that Ms. Hornot had accused him of coercing her into mediating and settling her personal injury case. When asked whether she had, in fact, accused Mr. Cardenas of these things, she testified that she had. Ms. Hornot further stated in her testimony at trial that "I did not agree to participate in a mediation willingly." She did admit, however, that Mr. Cardenas had never personally accused her of insurance fraud. Further, she testified that the reference in her petition to her being a victim of the crime of extortion did not refer to Mr. Cardenas. She said that what she meant by referring to extortion was "that threats were communicated to me by Mr. Cardenas because he had a responsibility and an *795 obligation as my attorney to tell me what the defense is [sic] intended to do if I did not agree to settle the case."
Ms. Hornot also testified that she understood that if she did not settle her personal injury case at mediation, the defense counsel would take action against her with respect to the alleged insurance fraud. Finally, Ms. Hornot testified that Mr. Cardenas defrauded her, because "I believe that the insurance defense attorney in the primary case did not communicate to Mr. Cardenas threats of insurance fraud and that whatever mention of insurance fraud took place, if any, was vague and innocuous, if anything, and that Mr. Cardenas used it as leverage to get me to settle the case."
Mr. Cardenas' testimony regarding the mediation and his representation of Ms. Hornot was very different from Ms. Hornot's testimony. Mr. Cardenas said that when Ms. Hornot first approached him about representing her in her personal injury case he was "flattered and honored that a fellow member of the bar would hire me." He also considered Ms. Hornot a "sophisticated client," because she had been a personal injury lawyer herself for over twenty years.
Mr. Cardenas was asked whether the reason that Ms. Hornot did not want to mediate her claims was that he had informed her that the defendants were saying that she was engaged in some type of insurance fraud. He said no, and he then testified, "That's not at all  that insurance fraud didn't really come up until after the settlement in terms of insurance fraud when I used those terms in my July 12th letter of 2002 to her." When asked whether he had communicated to Ms. Hornot that the defendants had hard evidence that she had engaged in insurance fraud at some time in the past, Mr. Cardenas replied, "No. That's an absolute fabrication on her part." Mr. Cardenas further explained that when he read Ms. Hornot's deposition, which was taken prior to his representation of Ms. Hornot, he noticed that her explanation for not seeking medical treatment for twenty-two months[2] after the accident was that she did not want to create a pre-existing condition that would not be covered under a medical insurance policy her office was in the process of obtaining.
Mr. Cardenas further testified that the term "insurance fraud" was used only after Ms. Hornot's case was settled. Mr. Cardenas said that he then wrote Ms. Hornot a letter in which he said that the "perception was going to be that you were willing to  not that you did  it was going to be that you were willing to engage in insurance fraud to protect yourself from exclusion of insurance coverage." Mr. Cardenas denied that he had ever told Ms. Hornot that the defendants in her personal injury lawsuit had hard evidence of insurance fraud. He stated, "[T]hat's an absolute fabrication. I never said that to her."
When Mr. Cardenas was asked about Ms. Hornot's immediate reaction to the settlement of her lawsuit, he testified that she was "thrilled." He stated, "She was calling me the best lawyer in the world, that she couldn't believe that we got $95,000 like I told her it would be, the top dollar we could possibly expect." He further testified that Ms. Hornot was "very, very happy" and that she gave him a "big hug."
*796 Mr. Cardenas testified that he tried contacting Ms. Hornot through letters and telephone calls in an attempt to get her to come to his office so that the settlement funds from her lawsuit could be disbursed from his client trust account. Ms. Hornot finally responded to the numerous calls and letters in a telephone call on July 9, 2002. According to Mr. Cardenas' testimony, in the telephone call Ms. Hornot said that she was very unhappy with the settlement and that he had forced her to mediate her claims. Mr. Cardenas testified that her feeling that he had not settled her case for enough money was "a shock to me." He further testified that the telephone conversation was the "first time she had ever voiced to me any dissatisfaction."
On July 12, 2002, three days after the July 9 telephone call, Mr. Cardenas wrote a letter to Ms. Hornot. He testified that he told her how hurt he was that she would accuse him of "coercion and forcing her to settle." He also stated that the words "insurance fraud" were used by him for the first time in the July 12 letter. He said that he reminded Ms. Hornot about the explanation that she gave in her deposition for her delay in seeking medical treatment, and he said that her explanation "could be perceived as insurance fraud."
Mr. Cardenas testified that he denied all the allegations against him that Ms. Hornot made in her petition. Further, he stated, "I deny that there was ever any conversation between me and Miss Hornot ever at mediation where I told her that they had insurance fraud information that I didn't know the basis of it; that I told her that if she didn't settle, that they were going to come arrest her or take some action against her. I vehemently deny any of that." Mr. Cardenas did note, however, that he was concerned that the defendants would try to create a credibility issue with respect to Ms. Hornot's deposition testimony that she did not seek medical help for her injuries for many months, because she did not want to have any pre-existing conditions when she applied for medical insurance.
Mr. Cardenas was questioned at the trial regarding the damages that he had suffered as a result of Ms. Hornot's lawsuit against him. He testified that he had not sought medical attention for the stress that he had suffered because of the case. He further stated that he did not know of any clients that he had lost as a result of the lawsuit and that he did not think that any bank had denied him credit as a result of the suit.
The trial court judge rendered judgment in favor of Mr. Cardenas and against Ms. Hornot. The judgment stated that the trial court found no facts to support the allegations made by Ms. Hornot against Mr. Cardenas, including the allegation that Ms. Hornot was a victim of criminal extortion. Additionally, the judgment held that Mr. Cardenas proved his claim of defamation against Ms. Hornot. The trial court awarded Mr. Cardenas $7,500.00 in damages.

DISCUSSION
Assignments of Error
Ms. Hornot raised several assignments of error on appeal. They are discussed below.
Assignment of Error No. 1: The trial court committed manifest error in refusing to issue a declaratory judgment in favor of the plaintiff, Ms. Hornot.
Although Ms. Hornot did not originally file suit for a declaratory judgment, she subsequently amended her petition to request a declaratory judgment that "Leonard Cardenas III made one or more statements accusing Janice Hornot of conduct *797 and/or actions that were, or are, criminal and/or illegal and/or unethical and/or unfounded and/or malicious and/or sanctionable, and that at the time he made those statements . . . he knew, or should have known, that one, or more of them, were false, or substantially false." Also, at the beginning of the trial of the instant case, Ms. Hornot's attorney advised the trial court that she was no longer seeking to challenge the terms of the settlement agreement in her personal injury case or to obtain damages from Mr. Cardenas. Rather, she was only seeking a declaratory judgment that Mr. Cardenas "has no information that she is guilty of a crime or unethical behavior in connection with the lawsuit that he represented her in some years ago."[3]
Louisiana Code of Civil Procedure article 1871 provides in relevant part that "[c]ourts of record within their respective jurisdictions may declare rights, status, and other legal relations whether or not further relief is or could be claimed." Louisiana Code of Civil Procedure article 1876 provides that "[t]he court may refuse to render a declaratory judgment or decree where such judgment or decree, if rendered, would not terminate the uncertainty or controversy giving rise to the proceeding."
This Court has stated with respect to the standard of review of a declaratory judgment action that "[o]n appeal, the scope of appellate review is confined to a determination of whether or not the trial court abused its discretion by granting or refusing to render a declaratory judgment." In re Peter, 98-0701, p. 4-5 (La. App. 4 Cir. 12/23/98), 735 So.2d 665, 667. See also Ricard v. State, 544 So.2d 1310, 1312 (La.App. 4th Cir.1989). It should also be noted that the Louisiana Supreme Court has declared that "[t]rial courts are vested with wide discretion in deciding whether to grant or refuse declaratory relief." Louisiana Supreme Court Committee on Bar Admissions ex rel. Webb v. Roberts, 00-2517, p. 3 (La.2/21/01), 779 So.2d 726, 728.
In the instant case Ms. Hornot abandoned her original claims against Mr. Cardenas at the beginning of the trial. She only sought to obtain a declaratory judgment. Although the trial court did not render a declaratory judgment, the court did itemize in the judgment all of the allegations made by Ms. Hornot for which the trial court found no supporting evidence. The trial court was not required to issue a declaratory judgment just because one had been requested.
As stated, we note that under La. C.C.P. art. 1876, a court may refuse to render a declaratory judgment if the judgment would not terminate the uncertainty or the controversy upon which a proceeding is based. In the instant case, a declaratory judgment that Mr. Cardenas was not in possession of information that indicated that Ms. Hornot was guilty of criminal or unethical behavior or that Ms. Hornot was not guilty of unethical or criminal behavior would not have terminated the controversy regarding Mr. Cardenas' claims against Ms. Hornot. Thus, the trial court had the right to decline to issue a declaratory judgment.
Based on the record before us, we find that the trial court judge did not abuse her discretion in failing to issue a declaratory judgment. This assignment of error is without merit.
*798 Assignment of Error No. 2: The trial court committed manifest error in failing to dismiss the reconventional demand of Mr. Cardenas on an exception of no cause of action and/or no right of action, which the trial court could have raised sua sponte.
Ms. Hornot filed an exception of no cause of action with the trial court, but the record does not reflect whether the trial court specifically considered the exception that was filed. Ms. Hornot also filed exceptions of both no cause of action and no right of action in this Court, which she is entitled to do under La. C.C.P. art. 2163.[4] Both the exception of no cause of action and the exception of no right of action present questions of law. Therefore, the standard of review of the trial court's action is a de novo review. See, e.g., Badeaux v. Southwest Computer Bureau, Inc., 05-0612, 05-719, p. 7 (La.3/17/06), 929 So.2d 1211, 1217. We will consider the exceptions of no cause of action that Ms. Hornot filed in the trial court, the exception of no cause of action that she filed in this Court, and the exception of no right of action that she filed in this Court.
Exceptions of no cause of action and no right of action are both peremptory exceptions[5], the function of which is "to have the plaintiff's action declared legally nonexistent, or barred by effect of law, and hence this exception tends to dismiss or defeat the action." La. C.C.P. art. 923. In the Badeaux case, the Louisiana Supreme Court discussed these two exceptions. The Supreme Court stated that "one of the primary differences between the exception of no right of action and no cause of action lies in the fact that the focus in an exception of no right of action is on whether the particular plaintiff has a right to bring the suit, while the focus in an exception of no cause of action is on whether the law provides a remedy against the particular defendant." 05-0612, 05-719, p. 6, 929 So.2d at 1216-17.
The Supreme Court further explained that the function of an exception of no right of action is to determine whether a plaintiff is included in the class of persons to whom the law has granted the cause of action that is asserted in the plaintiff's petition. Id. The Supreme Court also discussed the function of an exception of no cause of action and stated that an exception of no cause of action "questions whether the law extends a remedy against the defendant to anyone under the factual allegations of the petition." 05-0612, 05-719, p. 7, 929 So.2d at 1217.
In considering the merits of an exception of no cause of action, the trial court is required to decide whether to grant or deny the exception on the basis of the face of the petition. Id. To resolve the issues raised by an exception of no cause of action, "each well-pleaded fact in the petition must be accepted as true." Id. In the case of an exception of no right of action, however, evidence is admissible at a hearing on the exception to either support or rebut the exception. Eubanks v. Hoffman, 96-0629 (La.App. 4 Cir. 12/11/96), 685 So.2d 597, 600.
*799 Ms. Hornot asserted in her exception of no right of action that Mr. Cardenas did not have a right of action, because "[a]ny right of action for defamation does not vest in Mr. Cardenas until such time as the underlying case is terminated." In McCall v. Bologna, 465 So.2d 115, 116 (La.App. 4 Cir.1985), this Court stated that "[o]ur jurisprudence has consistently held that an action for libel or slander arising out of allegations or statements made in a judicial proceeding cannot be brought by a party to that proceeding until it is terminated." In Ortiz v. Barriffe, 523 So.2d 896, 898 (La.App. 4 Cir.1988), this Court also held that "an action for defamation arising out of allegations made in judicial proceeding [sic], and made against a party to those proceedings, cannot be brought until those proceedings are terminated."
We agree with Ms. Hornot that an action for defamation that arises out of allegations made against a party in the pleadings in a judicial proceeding cannot be brought until the judicial proceeding is terminated.[6] Nevertheless, in the instant case we find that the proceeding that gave rise to the allegations in the reconventional demand has, in effect, terminated, because prior to trial, Ms. Hornot withdrew the claims of malpractice and for damages in her petition and sought only declaratory relief.
The facts in the instant case are analogous to the facts in the Costello case discussed above. In the Costello case allegedly defamatory statements were made in the petition in a malpractice action against an attorney and his law firm. The attorneys who were sued filed a reconventional demand claiming damages for the allegedly defamatory allegations. The trial court granted a partial summary judgment in the case dismissing the plaintiff's claims. Thus, that aspect of the judicial proceeding was terminated. The trial court then proceeded to consider the reconventional demand. In the instant case the claims that gave rise to the allegations of defamation in the reconventional demand were withdrawn at the beginning of the trial.
In Palmer v. Ameriquest Mortgage Co., 41,576 (La.App. 2 Cir. 12/13/06), 945 So.2d 294, writ denied, 07-0353 (La.3/30/07), 953 So.2d 70, the Louisiana Second Circuit Court of Appeal was also faced with the issue of whether a reconventional demand alleging defamation arising from the pleadings in the main case was properly before the court. The court acknowledged that an action for defamation arising out of allegations made in judicial proceedings against a party to those proceedings could not be brought until those proceedings were terminated. In the Palmer case, however, the claims made in the original lawsuit were settled, and the court found that the reconventional demand could then be considered. The court stated:
Finally, Shidler showed that Palmer and Ameriquest have settled all underlying claims. This satisfies the requirement that the original action must be terminated before the plaintiff can proceed with his defamation or malicious prosecution claim.
41,576. p. 13, 945 So.2d at 302.
In the instant case, we find that the allegations made in the petition that gave rise to the defamation claims in the reconventional demand were withdrawn by Ms. Hornot at the beginning of the trial. At *800 that point the impediment to Mr. Cardenas' bringing suit for defamation had been removed, and he had a right of action against Ms. Hornot. Thus, we find that the reconventional demand was properly before the trial court, and we hereby deny Ms. Hornot's exception of no right of action.
In the case of the exceptions of no cause of action filed by Ms. Hornot in both the trial court and in this Court, we must review Mr. Cardenas' reconventional demand to determine whether the law extends a remedy against Ms. Hornot under the factual allegations of the pleadings contained in the demand. Ms. Hornot asserted in her exceptions of no cause of action that insufficient facts were contained in the reconventional demand for a valid defamation claim to have been asserted.
In Costello v. Hardy, 03-1146 (La.1/21/04), 864 So.2d 129, the Louisiana Supreme Court considered a case in which a legal malpractice claim was filed both against an attorney who had drafted a will and against his law firm. The attorneys filed a reconventional demand for defamation based on the allegations of the malpractice petition. The Supreme Court stated as follows:
Defamation is a tort which involves the invasion of a person's interest in his or her reputation and good name. "Four elements are necessary to establish a defamation cause of action: (1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault (negligence or greater) on the part of the publisher; and (4) resulting injury." The fault requirement is often set forth in the jurisprudence as malice, actual or implied. Thus, in order to prevail on a defamation claim, a plaintiff must prove "`that the defendant, with actual malice or other fault, published a false statement with defamatory words which caused plaintiff damages.'" If even one of the required elements of the tort is lacking, the cause of action fails.
03-1146, p. 12, 864 So.2d at 139-140 (citations omitted).
The Supreme Court further explained in Costello that defamatory words can be either defamatory per se or susceptible of a defamatory meaning. The Supreme Court stated that "[w]ords which expressly or implicitly accuse another of criminal conduct, or which by their very nature tend to injure one's personal or professional reputation, even without considering extrinsic facts or surrounding circumstances, are considered defamatory per se." 03-1146, p. 13-14, 864 So.2d 140. If publication of words that are defamatory per se is proven, the elements of falsity, malice, fault, and injury are presumed, but they can be rebutted. Id.
In Costello the Supreme Court found that there was no factual support for the legal malpractice claim and that the allegations in the petition in that case were defamatory. They were not defamatory per se, however, and malice on the part of the plaintiff in making the defamatory allegations was not proven. Therefore, because the element of malice was not proven, the claim for defamation was likewise not proven, and no damages were awarded.
In the instant case, Ms. Hornot alleged in her petition that Mr. Cardenas "pursued and followed a course of conduct and behavior toward Plaintiff which was designed and intended to pressure, coerce, force, intimidate and threaten Plaintiff to such a degree and extent that Plaintiff would agree to `settle' despite her adamant unwillingness to settle." Ms. Hornot also claimed in her petition that "she was a victim of the crime of extortion, as that term is defined in the Louisiana Criminal Code. . . ."
*801 In his reconventional demand, Mr. Cardenas alleged that, among other things, Ms. Hornot's lawsuit was frivolous and was defamatory. He also alleged that the petition "constitutes malicious prosecution," but during the course of the litigation, he withdrew that claim as being premature.
In the instant case, the reconventional demand contained sufficient allegations to state a cause of action for defamation. The petition contained defamatory statements, and the statements were published in a public court record. Because there were allegations that the crime of extortion was committed, there was an allegation that was defamatory per se. Thus, the element of falsity, the element of malice, and the element of injury were presumed. Although Ms. Hornot would have the opportunity to assert defenses to the cause of action for defamation, there was a valid cause of action alleged on the face of the reconventional demand. We, therefore, deny Ms. Hornot's exception of no cause of action and affirm the finding by the trial court that Mr. Cardenas did state a cause of action against Ms. Hornot.
Assignment of Error No. 3: The trial court committed manifest error in failing to grant the peremptory exception of no cause of action filed by Ms. Hornot prior to granting a judgment in favor of Mr. Cardenas.
As set forth in the discussion of the previous assignment of error, we find that Mr. Cardenas did state a cause of action in his reconventional demand. Therefore, this assignment of error is without merit.
Assignment of Error No. 4: The trial court committed manifest error in finding and holding that there were no facts to support the plaintiff's allegation of being a victim of extortion under the Louisiana criminal statute.
In Rosell v. ESCO, 549 So.2d 840 (La. 1989), the Louisiana Supreme Court discussed the scope of the appellate court's review of a trial court's findings of fact as follows:
It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. . . . Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. . . .
When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said.
Id. at 844. See also Stobart v. State, Through Dep't of Transp. and Dev., 617 So.2d 880, 882 (La.1993); Harvey v. Cole, 00-1849, p. 2-3 (La.App. 4 Cir. 1/23/02), 808 So.2d 771, 775-76.
In the instant case much of the testimony of Mr. Cardenas completely contradicted the testimony of Ms. Hornot. Thus, there were two sets of facts presented to the trial court judge. Therefore, there were two permissible views of the evidence, and the trial court judge's choice regarding which was the correct view cannot be manifestly erroneous or clearly wrong. Rosell, 549 So.2d at 844. The trial court judge had the benefit of observing the demeanor of the parties while they *802 were testifying and was, therefore, in a better position than this Court to judge the credibility of the witnesses.
We do not find that the trial court judge was manifestly erroneous or clearly wrong in determining that there were no facts to support Ms. Hornot's allegation that she was a victim of extortion. This assignment of error is without merit.
Assignment of Error No. 5: The trial court committed manifest error in finding and holding that Mr. Cardenas has provided sufficient evidence to support a claim of defamation per se.
Ms. Hornot argues that the trial court's finding that Mr. Cardenas proved a claim of defamation per se was manifestly erroneous. She contends that the statements she made were not false. The veracity of those statements is a matter of fact that is within the province of the trial court. Rosell, 549 at 844.
Defamation per se is proven if the evidence demonstrates that a party has called a person a criminal or accused that person of being a criminal and has published the statement. In the instant case, based on the lack of credibility of Ms. Hornot, the trial court found that Ms. Hornot had falsely accused Mr. Cardenas in her malpractice petition of committing the crime of extortion. Further, Ms. Hornot presented no evidence that the person she accused of extortion in her petition was anyone other than Mr. Cardenas, the party she was suing and the only person named in her petition.
Only if we were to find that the trial court committed manifest error or was clearly wrong in making the factual finding of defamation per se would we reevaluate the finding. In the instant case, as discussed in connection with the previous assignments of error, we do not find that the trial court's factual findings were either manifestly erroneous or clearly wrong. This assignment of error is without merit.
Assignment of Error No. 6: The trial court erred in finding that the defenses of truth, qualified privilege, and absolute privilege did not absolve Ms. Hornot of all liability for defamation.
Truth as a Defense
Ms. Hornot argues that because the allegations she made in her petition in the instant case were truthful, the trial court erred in holding her liable for defamation. As discussed in connection with the previous assignments of error, the trial court made a factual determination that the allegations were not supported by the evidence and were, therefore, false. Also, as previously discussed, we find that there was no manifest error in the trial court's findings of fact, which were based primarily on a determination of the credibility of the parties. We cannot say that the trial court judge was clearly wrong in her findings. Therefore, the defense of truth was not available to Ms. Hornot after the trial court found that her testimony was not credible. This aspect of her assignment of error is without merit.
Qualified Privilege
Additionally, Ms. Hornot argues that for her to be liable for defaming Mr. Cardenas, she had to have made the allegedly defamatory allegations in her petition with actual malice. She bases this argument on her contention that she is entitled to the privilege set forth in La. R.S. 14:49. That statute provides in relevant part as follows:
A qualified privilege exists and actual malice must be proved, regardless of whether the publication is true or false, in the following situations:
. . . .

*803 (4) Where the publication or expression is made by an attorney or party in a judicial proceeding.
Although La. R.S. 14:49 is part of the Louisiana Criminal Code, the qualified privileges that it enumerates as defenses for criminal defamation as defined in La. R.S. 14:47 are also applicable to civil defamation cases. See Reporter's Comments  1959 to La. R.S. 14:47 and the cases cited in the comments. In the Costello case, the Louisiana Supreme Court stated that "[s]tatements made in the course of a judicial proceeding are subject to a qualified privilege if the statements are material to the proceeding, and are made with probable cause and without malice." 03-1146, p. 16 n. 13, 864 So.2d at 142 n. 13. The issue before us then is whether or not Ms. Hornot made the allegations in her petition with actual malice.
In Tarpley v. Colfax Chronicle, 94-2919 (La.2/17/95), 650 So.2d 738, the Louisiana Supreme Court discussed the standard for proving actual malice as follows:
The actual malice standard is not satisfied merely through showing ill will or "malice" in the ordinary sense of the word. Moreover, actual malice may not be inferred from evidence of personal spite, an intention to injure, or a bad motive. Harte-Hanks Communications, Inc., 491 U.S. at 667, 109 S.Ct. at 2686, Rather, at the very least, actual malice requires that the statement was made with a reckless disregard for the truth. To establish a reckless disregard for the truth, the defamation plaintiff must show that the false publication was made with a "high degree of awareness of probable falsity" or the defendant "entertained serious doubt as to the truth of his publication." Id.

94-2919, p. 2, 650 So.2d at 738.
In the most recent Louisiana Supreme Court case discussing the meaning of actual malice in a defamation action, Kennedy v. Sheriff of East Baton Rouge, 05-1418 (La.7/10/06), 935 So.2d 669, the Louisiana Supreme Court held that "knowledge of falsity or reckless disregard for truth . . . is the standard by which abuse of the conditional privilege asserted in this case is to be determined." 05-1418, p. 24, 935 So.2d at 686. Thus, to prove actual malice in a defamation case where a conditional privilege is asserted as a defense, the party claiming defamation must prove that the defamatory statements were made with knowledge that the defamatory statements were false or were made with a reckless disregard for the truth.
In the instant case, the trial court found that there was no factual basis for any of the allegations made by Ms. Hornot. Thus, the statements were false. Further, one of the allegations, that of the commission of the crime of extortion, was defamatory per se.
From our reading of the record it is clear that Ms. Hornot was not satisfied with the amount of the settlement in her personal injury case. In an attempt to increase the amount she recovered, she decided to file a lawsuit against Mr. Cardenas alleging that he committed fraud, that he coerced her to settle her case, and that she was the subject of criminal extortion. Before trial, when she was being confronted with a defamation suit in Mr. Cardenas' reconventional demand, she simply abandoned her claims for malpractice and damages. From this action, we can reasonably infer that Ms. Hornot did not actually believe that she had been coerced or induced to settle her case by fraud or criminal actions perpetrated against her. The trial court found that at the trial Ms. Hornot was not telling the truth but that Mr. *804 Cardenas was. Because the trial court judge determined the facts in this case based on the credibility of the witnesses, we must defer to her findings as to which party was truthful and which was not.
Not only did the trial court judge find Mr. Cardenas to be the truthful party, the facts proven at trial show that Mr. Cardenas never raised the issue of "insurance fraud" until he did so in a letter that he wrote after Ms. Hornot expressed her dissatisfaction with the $95,000.00 mediation settlement. The idea of insurance fraud was derived from Ms. Hornot's own deposition, which was taken prior to Mr. Cardenas' representation of Ms. Hornot. In her deposition Ms. Hornot herself raised the specter of insurance fraud as a possible issue in her personal injury case when she explained the lengthy delay in seeking medical treatment for her injuries. She testified at her deposition that she delayed seeking medical treatment, because she did not want to create a record of a pre-existing condition should she apply for medical insurance.
Mr. Cardenas told Ms. Hornot from the beginning that her statement might create problems with her case. The defense in the personal injury case might put her credibility at issue, because an inference could be made that Ms. Hornot might be less than honest. The record shows that Mr. Cardenas discussed this issue with Ms. Hornot, but there is no evidence whatsoever other than Ms. Hornot's testimony, which the trial court determined was not truthful, that Mr. Cardenas or anyone else ever raised the issue of insurance fraud with Ms. Hornot to coerce her to settle her case.
Further, Mr. Cardenas testified that the reason he wanted to mediate the personal injury case before going to trial was that he wanted to "flesh out" the defenses that would be raised at the trial, not that he wanted to settle Ms. Hornot's case quickly. This statement is substantiated by the unrefuted evidence that he initially thought a $100,000 recovery would probably be the most that could be expected in Ms. Hornot's case given a number of problems that Mr. Cardenas thought the case had. Therefore, it seems perfectly reasonable that Ms. Hornot would readily agree to a settlement offer of $95,000.00.
Based on the record before us, we find that not only did Ms. Hornot knowingly fail to tell the truth in her petition, she also did so with a reckless disregard for the truth. Thus we find that the false allegations in the petition in the instant case were made with actual malice. Ms. Hornot is not entitled to the protection of the qualified privilege that she seeks to use. This aspect of her assignment of error is without merit.
Absolute Privilege
Ms. Hornot also claims an absolute privilege with respect to the defamatory allegations in the petition in the instant case. She bases her claim of absolute privilege on the provisions of La. R.S. 14:50, which reads in part as follows:
There shall be no prosecution for defamation in the following situations:
. . . .
(2) When a statement is made by a witness in a judicial proceeding, or in any other legal proceeding where testimony may be required by law, and such statement is reasonably believed by the witness to be relevant to the matter in controversy.
Like La. R.S. 14:49, La. R.S. 14:50 is also found in the Louisiana Criminal Code, but the privileges it establishes can also apply in civil cases. Reporter's Comment  1950 to La. R.S. 14:50.
As discussed in connection with the qualified privilege claimed by Ms. Hornot, *805 we find that Ms. Hornot knew the allegedly defamatory statements made by her were not true. The trial court specifically found no facts to support any of Ms. Hornot's allegations against Mr. Cardenas. The trial court judge also specifically found that Ms. Hornot had made a statement that was defamatory per se accusing Mr. Cardenas of criminal conduct. Thus, we find that the record before us and the trial court's findings mandate the conclusion that Ms. Hornot did not make the allegations with a reasonable belief in their truth. Because the statements were false, and because Ms. Hornot knew that they were false or reasonably should have known they were false, the statements could not have been relevant to the matter in controversy.
Although the defamatory allegations made by Ms. Hornot may have been technically "relevant" to her false claims, to grant Ms. Hornot an absolute privilege in the instant case would result in an abuse of the judicial process. We cannot allow a person to make defamatory statements to support a claim for damages when that person knows that the defamatory statements, though possibly relevant to the claim, are false. In our system of justice knowingly false claims cannot be protected by an absolute privilege even though the privilege may technically apply, because such a result would be tantamount to permitting perjury under the guise of an absolute privilege. Thus, Ms. Hornot is not entitled to claim the benefit of absolute privilege.
The defamatory statements in Ms. Hornot's petition were not reasonably believed to be relevant to the truth of the matter in controversy, because there was no valid basis upon which the claims could have been truthfully made. This assignment of error relating to absolute privilege is without merit.
Assignment of Error No. 7: The trial court committed manifest error in finding and holding that Mr. Cardenas was entitled to a judgment in his favor and against Ms. Hornot for the full and true sum of Seven Thousand Five Hundred Dollars ($7,500.00).
Ms. Hornot argues that Mr. Cardenas was not entitled to a damage award based on the intentional infliction of emotional distress or to an award of attorney's fees. In her brief Ms. Hornot assumed that the basis for the award made to Mr. Cardenas was either to compensate him for the intentional infliction of emotional distress or for his attorney's fees in the instant case.
In the judgment in the instant case, however, the trial court stated that the award was made "[g]iven the time taken to defend this matter." We do not find that this indicates that the award was made for attorney's fees. Rather, we find the damages awarded to be general damages incurred by Mr. Cardenas as a result of having a defamatory lawsuit filed against him. When a party proves the publication of words that are defamatory per se, the element of injury may be presumed. Costello, 03-1146, p. 14, 864 So.2d at 140.
The Louisiana Supreme Court in the Costello case stated that "[t]he injury resulting from a defamatory statement may include nonpecuniary or general damages such as injury to reputation, personal humiliation, embarrassment and mental anguish even when no special damage such as loss of income is claimed." 03-1146, p. 14, 864 So.2d at 141. See also Lemeshewsky v. Dumaine, 464 So.2d 973, 976 (La. App. 4 Cir.1985). Mr. Cardenas testified at the trial that he suffered from these types of damages. He was particularly concerned about his professional reputation and the effect the suit by Ms. Hornot *806 might have on that. We find that Mr. Cardenas suffered injury from the defamatory allegations made by Ms. Hornot.
We find that Mr. Cardenas was entitled to an award of damages. Therefore, this assignment of error is without merit.
Answer to Appeal
Mr. Cardenas answered the appeal claiming that the damage award in the instant case was abusively low. He suggested that the award should be increased to $50,000.00.
La. Civil Code art. 2324.1 provides that "[i]n the assessment of damages in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury." The standard for appellate court review of a trial court's award of general damages was discussed by the Louisiana Supreme Court in Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La. 1993). The Court stated:
"[T]he discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award."
623 So.2d at 1261. See also Reck v. Stevens, 373 So.2d 498 (La.1979).
In the Lemeshewsky case, cited above, this Court stated that "[a]s to quantum, damage awards in defamation cases must of necessity be largely left to the discretion of the trial court and should not be disturbed absent a showing of manifest error." 464 So.2d at 976. In the instant case, we find that the award is one that a reasonable trier of fact could assess, that the award is supported by the record, that there is no indication of an abuse of discretion by the trial court judge, and that the trial court judge did not abuse her discretion in making the award. Therefore, we decline to adjust the damage award.

DECREE
The assignments of error by Ms. Hornot are without merit, and the answer to the appeal provides no basis for increasing the damage award. The judgment of the trial court is hereby affirmed.
AFFIRMED.
NOTES
[1] The record reflects that Ms. Hornot never signed and returned the copy of the letter. Ms. Hornot later reported Mr. Cardenas to the Louisiana Attorney Disciplinary Board's Office of Disciplinary Counsel, and Mr. Cardenas was found to have violated the Rules of Professional Conduct for attorneys by failing to obtain a signed contingency fee agreement.
[2] The record contains references to both fifteen months and to twenty-two months as the time period after the accident during which Ms. Hornot failed to seek medical treatment for her injuries.
[3] We acknowledge that there is some difference between the language used in the amended petition and the language used at the beginning of the trial to describe the declaratory judgment that was sought.
[4] La. C.C.P. art. 2163 provides in relevant part that "[t]he appellate court may consider the peremptory exception filed for the first time in that court, if pleaded prior to a submission of the case for a decision, and if proof of the ground of the exception appears of record."
[5] La. C.C.P. art 927 provides in relevant part:

A. The objections which may be raised through the peremptory exception include but are not limited to the following:
. . . .
(4) No cause of action.
(5) No right of action, or no interest in the plaintiff to institute the suit.
[6] We note that in Ballex v. Naccari, 95-0057 (La.App. 4 Cir. 6/7/95), 657 So.2d 511, this Court even held that the laws on compulsory reconvention and res judicata did not invalidate the jurisprudential rule that an action for defamation arising out of allegations made in judicial proceedings against a party to the proceedings cannot be brought until the proceedings are terminated.